1542 Airport Road Associates, Ltd. v. United States 1542 Airport Road Associates, Ltd. Whenever you're ready. Good morning. Chief Judge Prost, members of the panel, may it please the Court, my name is Mark Lando of Echlin and Lando. I represent the ten appellants in this matter who I've referred to as the owners or the partnerships. This appeal is about the proper application of the Supreme Court's holding in Franconia, in particular the analysis and holding of that decision regarding the time for performance. In terms of how I'll approach the argument today, I'll begin with a discussion of Franconia, in particular its focus on time for performance and the requirements of the penury design. Well, how much specificity? I mean, your argument that there has to be a time for performance. What does that mean? How much specificity is required with respect to the time for performance? If I send a letter and say, I'm thinking about doing this over the next three years, I presume you wouldn't think that that was sufficient for time for performance, right? Yes. I think the issue, Judge Prost, is whether the notice puts the government on sufficient notice of what they have to do and when. Remember, this is an option contract, so it's within the option holder's purview. The power that that option holder has is to decide whether and when the government, the other side, will actually perform its obligation. So there needs to be some sufficient notice as to when that will happen. So you think of the classic example of an anticipatory repudiation where the contract says, I'm going to paint your house on July 1 this summer. I repudiate the contract before that, and the issue is, does the other side know when they will be required to perform? So the letter has to have enough specificity to either specify a date or at least a reasonable time period, or be reasonably construed as a demand for immediate performance. And we would submit that the letter at issue here, Mr. Olson's letter of April 2, 2002, does not do either of those. It does not set a date for performance. There's no dispute between the parties that there's no specific date or time for performance specified. So without that... What about if he had said, I'm trying to get this done as soon as possible? Is that sufficient? I think that would... I think arguably it would. I think you'd have to look at the content of the letter, the evidence. You'd have to look at the government's response to that letter and say, what did the parties understand here? And in this case, I don't think there's any... Isn't that the point, the government's response? Isn't your point that the government didn't repudiate the obligation? They did repudiate it. The question is, when did that repudiation ripen into a breach? And that's exactly what the Franconia decision is all about. The repudiation happened back in 1988 and 1992. But they didn't... I think your point is they didn't refuse to accept. They just didn't get to that point. Yes, Your Honor. It's both. There's the tender, which needs to specify or at least reflect, be reasonably construed as pointing to a time for performance. And then the second step is that you need that rejection or dishonor. Tender and dishonor are the terms that the Supreme Court used in Franconia. You have to have both of those. That's the whole nature of the difference between a repudiation and a rejection. What if the government had lost the letter or hadn't responded at all? At what point does it count as a rejection? It would never count as a rejection unless there was a time for performance. Again, no breach can occur until the time for performance arrives. So it still comes back to the question of whether... So if I go in and I say I want to do this and I want to do it within the next six months and six months pass and the government hasn't responded at all, that's sufficient, right? Absolutely. And that's a great example of the Parkwood case. I think if you want to look at a decision that pulls everything together, Franconia, Camerlane, and all of these rules, the Parkwood case, Judge Allegra got it exactly right. In Camerlane, this court said we're going to look at the rejection based on when the government basically made a counteroffer by providing an offer of incentives. You're saying you want to prepay. We're going to give you something else. That's a breach. This court also said there could be other conduct. It could happen sooner. And the Parkwood case and the Ramona, one in Ramona, two cases following it, nicely applied that principle to say, okay, how early could it be under the Federal Circus decision in Camerlane? And the earliest it could possibly be is at the time for performance. So in your example, I'm going to... I want to prepay in six months. There the owner has set a time for performance. That time for performance arrives. There's no response by the government, and that is a breach. And that's also consistent with the Kaczarski decision from this court, which... And what if you say, I want to perform as soon as... I want to do it as soon as possible, and six months passes and you don't hear from the government? I think if you say as soon as possible, then that is implying now. I want to prepay now. And therefore, you are setting a time for performance. So if that letter, I think in that case, Your Honor, that letter could, or that communication could reasonably be construed as saying, now is the time. I want to do it. So how do we cabin the statement in Camerlane, which everybody seems to be having concern over, which is this rejection of a need for formalism? How do you do... Are you cabbing it to simply the direct transfer of money or payment in Freconia? Or how do we cabin that? Yes, I think the issue on tender and formalism is that tender is the word that the Supreme Court used in Franconia. The plaintiffs, the appellants in Camerlane said, well, tender means you got to show up with the money. And this court, I think, properly rejected that. The court said it doesn't have to be that formalistic. But it still does have to be something that sets a time for performance. That's really the rule that it comes back to. The actual initial letter, am I remembering right, in Camerlane didn't set a time for performance. It used slightly more performative language than your letter does. But there wasn't a time set. Was there in the letter sent to Camerlane? The letter that was in the record before this court here directed not specifically set a time for performance. And I think that's the tricky issue that if this court were to rule in favor of the appellants here, that would have to be dealt with. And the simple answer, Your Honor, is simply that the time for performance was not raised by the parties in that case because it was a non-issue. As we know from the record, as we presented in our record in the court below, there was in fact a full-blown prepayment request, which under the agency's rules requires a time for performance to be set. And it always has to be at least six months after the date of the request. In fact, even before the repudiation, before the Olympus statute was passed, the agency's regulations even then said there has to be at least a six-month waiting period. Just on that point, so if your, I think all of your agreements say, all of your loan agreements say, unless inconsistently something else in this agreement, these agreements are subject to applicable government regulations or something like that. And at least by 1988, as I understand it, there were regulations in place before the congressional repudiation that required at a minimum specification of the date of prepayment. Does that, is that relevant to and helpful to you in deciding what the necessary interpretation of the 2002 letter is here and the silence on the government's part? Namely, without that, they weren't saying no because there was a perfectly applicable legitimate precondition, which you didn't specify. Yes, Your Honor. I think those regulations do help us. I have to make one correction. The regulations in place before Olympus, the repudiating statute, did include a 180-day waiting period. And that may have been inconsistent with your absolute right to prepay. And so maybe that one wasn't applicable. But one of the things the regulations required was date of prepayment, number 19 on whatever the exhibit C or something to 1965.90 regulations from 1988. That one, it seems to me, is not at all inconsistent with your right to prepay. Just give us the date. And since you didn't say that, then you hadn't really made a qualifying tender, even in, made a qualifying tender. Yes, I agree with Your Honor. What I was getting at is I don't believe the regulation that said you must specify a date was issued until after Olympus with the repudiation. Well, I'm looking at the 1988 CFR, and it's in here. Maybe I'm wrong. Olympus was passed in 88. In 88. Yes, I think the confusion, Your Honor, might be that there were actually two repudiating statutes. Well, this was actually issued in the Federal Register in 1987, so I just have the 88 CFR. Okay. I think Olympus was actually initially passed in 88, but maybe not effective in 87, but not effective until 88. Okay. But it all happened around the same time period. But I think it all does reflect the fact that if you're trying to prepay a mortgage, it can't happen overnight like that. You need to line up the financing. If the sale is, if the prepayment is going to be based on a sale, you need to know if the sales are actually going to come through. It doesn't happen automatically. And for those same reasons, the government would not reasonably understand when they get a letter like Mr. Olson's letter that they're being asked to perform that day. That's right. The Olson letter, isn't that reasonably interpreted as being within a reasonable period of time? And, in fact, the government answered within 15 days and said, well, give us more information. There wasn't repudiation. But then your client dropped the ball, right, and didn't proceed for real. And now what happened? That is exactly what happened, Your Honor. And that shows that the 11 partnerships here never set a date for performance. They just indicated that they had some potential sales. If you read the whole letter, you can see Mr. Olson is talking about 11 properties all over the state of Louisiana with different partnership entities involved, saying that they're potentially going to be selling some of these properties, maybe keeping and prepaying the ones that will not be sold, that they may be converting them to conventional housing, but the nonprofit may or may not be doing so. So those are all uncertainties and all reasons why the letter could not reasonably be construed as setting any time for performance. And as you say, Your Honor, the government responds. And what do they say? Oh, if you want to prepay, fine. Here's what you do. Here's the checklist. Included in that checklist, of course, is the requirement to say when, to specify when you are going to prepay. The owners never did that. And the reason, of course, is because the sales fell through. And so that time for performance never arrived. Can I just ask you a little technical question on the regulations, the CFR 1965? They were in effect in 2002, right? But they seem to have been removed several years later. Are they still in effect? Were they just put in some other place? They were moved, Your Honor. Yeah, so they're now in 7 CFR 3560. I think there's a footnote in our opening brief that mentions the fact that we're talking about the regulations that were in effect in 2002. And it was, I believe, in 2004 that they were moved within 7 CFR 3560. And can I ask you a question on a different topic from the one we've discussed? Suppose I were to think that under these loans, every time you made a request to repay and the government said no, it was a new breach, which seems to me pretty much what normal standards for, what is it, continuing harm or whatever that law would say in the employment context and elsewhere. New wrong. How, if I thought that were the case, would that be consistent with Tamerlane? Your Honor, I think that if the owner sets a time for performance and the government does not perform as of that date, then you have a breach. And if you ask seven years later and they say no, you have another breach. Suppose I thought that that were true. Can I say that consistent with Tamerlane? I don't think so, Your Honor. I think in this context, at least, where the government has repudiated the contract way back in 1988 and 92, that as an owner, once you try to exercise that option, your original contractual option has been repudiated, and the government, you have the tender and you have the dishonor under Franconia. I think you have a breach. You've got to file your suit, and I don't believe you would be able to bring a subsequent suit under a continuing breach. So once they say no and you don't sue, you're stuck for 50 years, even though the express terms of the loan say you can prepay at any time? Well, I think the answer is that although you're stuck for 50 years, as all of our owners are, you do have a remedy, which is to bring suit in the Court of Federal Claims, which is tying things up exactly what these owners did in a timely manner within six years of when there was finally a breach many years later for some of the properties or by electing to file suit in light of the repudiation, as is their other option under anticipatory repudiation. So is the differentiation you're making to the cases that Judge Toronto is referring to that rely on a continuing violation so that you can request over and over again, is that because of the repudiation here? That differentiates the circumstance? I believe so. I believe there's other authority in this context stating that you can't rely on a continuing breach theory. That may have actually been addressed either in Cameron or on remand. Right. So I guess I put it this way. The Court of Federal Claims did reject this theory in Tamerlane. Suppose I thought it was just plain wrong. What do I do then? If Your Honor believes it's wrong, then I think you could make a ruling that you would have another alternative. Obviously, if it were only the Court of Federal Claims that said that, that wouldn't be a problem. Of course not. But if this court said, held, implicitly ruled that, that would be a problem. It wouldn't be a problem for these owners. It means that tomorrow you can ask again. In theory, I suppose they could ask again and be denied again. But I think the proper rule is that once you know the time for performance has come and you want to prepay and you make the request and the government doesn't follow through, they dishonor that request, then you know you've been damaged. You can think of it in those terms. When has the repudiation actually been applied to your situation, to your property? But why isn't the answer to that every single time you ask? Because you've already suffered the damages the first time. Right. So damages clearly would not reach back to the first time. But it would start again with a new denial. I think, Your Honor, that once you're damaged, damages have been suffered, that you need to return your claim within six years. And you shouldn't get a second bite of the apple. That's certainly not what these partnerships are looking to do. Thank you. I will restore two minutes of rebuttal, because we've exceeded our time. Thank you, Your Honor. Good morning, and may it please the Court. The Court should affirm the judgment of the Court of Federal Claims because the Court correctly applied this Court's precedent in Tamerlane, as well as the Supreme Court's precedent in Franconia, in holding that the letters submitted by the owners did constitute a valid prepayment request, and that by not accepting that request, the government breached the prepayment rights in the contracts. Before ALIPPA, were there any regulatory requirements, such as, give us the date that were applicable? To my knowledge, there were not. I believe— So the regulations I was looking at didn't take a—weren't in place before ALIPPA. They were somehow anticipatory. To the best of my knowledge, the regulations in 1965 were promulgated in response to ALIPPA. I'm not familiar with any regulations that required that, that predate that. How was the government's action on April 17th, the repudiation? Well, the repudiation occurred when Congress passed ALIPPA. As the Supreme Court said in Franconia, by restricting the prepayment right and announcing the intention that we're not going to accept a prepayment, that was the repudiation. If that's true, there were long since—but that's not the holding here, right? Well, under an anticipatory repudiation, the repudiation ripens into a breach. And this is straight out of Franconia. When an owner attempts to exercise the prepayment right, that's when the government's duty first arises. And by not simply accepting the exercise of prepayment, that repudiation ripens into a full-blown breach. But the letter of April 17th was more an acceptance than a repudiation. It just said, fill in the data. It was information. And I think it's important, if I can, to walk through. What the letter said is follow this application process. This process, that's part of ALIPPA. That's part of the original repudiation. And it's much more cumbersome than simply filling out a simple form, writing a check, and mailing it in. The owners have to figure out what the projected rents on the property are going to be after prepayment. The letter says to further assist you. I would consider this letter to be positive rather than negative. Under Tamerlane, this court said that once someone has made, as an owner has exercised their prepayment right, the government has no choice. It has to accept that right. And that by doing anything that's inconsistent with just submit us a check, send us a check, that that ripens right into a breach. I don't understand. Isn't it fair to differentiate between the government coming back and saying, you've got to give us this information before we'll consider your application, meaning that the government did not consider the application on the merits. Isn't that precisely what happened here? And under the regulations, this is sort of a requirement for how the request procedure works. Right? The government did not consider, did not accept, it acknowledged in its response, yes, this is a prepayment. You wrote, you requested a prepay. It did not say, okay, we're going to accept your prepayment. No, and it didn't say, we're not going to accept your prepayment. It suggested, as I think Judge Lori was saying, that we need more information before we can consider this request. And that's precisely where Tamerlane holds, that by not accepting, the repudiation ripens into a full-blown breach. In Tamerlane, were all the papers filled out before the government said no? No, I believe there were no, the only letters, the only documents that this court was looking at in Tamerlane were the two letters that are very similar to the letters that were submitted in this case. The court was not presented with applications or anything of the sort. The appellants are simply inferring their existence from the- The fact that the government didn't respond for six months, which was kind of the period for- Well, the government- And they eventually accepted the incentive appeal, right? So they must have filled out the papers. I think over a year later, there was, they must have filled out something probably. But there's a note in Tamerlane that says the initial reaction for at least one of those properties was just an outright rejection from the government. But there's also a note in Tamerlane where the court- The court says, although other conduct could constitute, it already held at least by the point, other conduct could constitute breach by the government, the Court of Federal Claims correctly ruled that at least by 1991 and 1992 when the offers of incentives were made, the breach-triggering rejections had occurred. And under the rules that were in place at that time, did the offers of incentives precede the filling out of the papers or did they follow the filling out of- They followed the filling out. So one can probably actually infer that those papers were filled out. You can probably infer that those papers were filled out. So we don't have a situation like the present one where there is nothing more than, we're interested in prepaying, response from the government, fill out these papers. They hadn't gotten to the point of saying, and we're not going to pay you. It's even worse than that. We're not going to accept your money. The agency under ILLIPA is not even permitted to consider a prepayment request unless the application is deemed complete. In order to have an application deemed complete- How does that help you, though? Doesn't that demonstrate that the response in 2002 was not a consideration of the application? It's almost equivalent of ignoring it. It's not accepting it. As Tamara and Francona made clear- What is equivalent to ignoring it? You're talking about the government's response here in 2002. I just want to be clear what you're saying. Excuse me, Your Honor. What's equivalent to ignoring it is the government's policy, the requirement that we will not consider a prepayment request until you have submitted a completed application, which is very, very onerous and burdensome. It requires a lot of money. A lot of investigation by the owners. It takes months to complete. Those are precisely the fetters. That's precisely the repudiation. It's implementing the repudiation that the Supreme Court held Olimpia constituted. What's implementing the repudiation? The onerous requirements- This application process. It's not simply buying a car and we fill out a form. That was pretty onerous. Have you bought a car recently? Well, I just refurbished the house. Oh, well, then you know, yeah. But- So the government doesn't have to- I mean, just by the existence of this regime, it's a rejection even before there's a request, no matter what the request says or how- Essentially, yes. I mean, there's still a chance for the government. Congress could amend the law and say, you know, this is an unfettered right, they can exercise it. And back in the pre-Olimpia days, property owners would literally just, you know, call up or write a letter and say, I want a prepay. The response was, okay, send us your check. That still happens today where owners will sometimes even just go to the regional offices with a check in hand. And there's a number of instruction provided by the agency that says you cannot accept an actual, you know, certified check until they've gone through this whole burdensome process. So by requiring them to do that, that does constitute- Is there anything in Franconia that suggests that? Yes, Your Honor. In Franconia, it says the property owners had an unfettered right to prepay their contracts. And that won't ripen into a breach until they attempt to prepay, which I think is what we have here. You have an attempt to prepay. At that point, the government's duty is triggered. That duty, consistent with these mortgages, is simply to accept the prepayment request. But everything involving transfer of real estate and loans involves paperwork. Just requiring filling out a form, completing the application, isn't a repudiation. If it was as simple as, you know, they write the letter, we want to prepay, okay, let's sit down and figure out what the amount that you owe is, what the payoff amount is going to be. There may be a de minimis amount of work involved with that. We'll concede that. And it may take a few days to do that. But you're still in the process of accepting it. You're not saying, we're not going to. And the point of this application process, the point of the regulations, is to avoid accepting it. The first thing the government does whenever it receives a completed application is it looks to see if there's other, you know... So I guess I just want to be clear on what you're saying. Let's assume that you're saying that the system that's set up, which requires that somebody fill out papers before the government will consider the application, is in and of itself a rejection, because the government is requiring that you fill out some papers. Because the government is not immediately accepting your request. And it's, again, it's more than filling out papers. But is there anything in the regime that existed before Olympus suggests that the government couldn't require you to do anything other than hand over? I mean, we're all in Washington, right? I mean, doing anything, as my colleague suggested, requires that you fill out some paperwork and that you comply with certain requirements before it will even be considered. That's why I'm kind of puzzled by your suggestion that when the government is requiring that you fill out some papers, that that, in and of itself, is a rejection. Because it's substantially more than simply filling out some papers. So filling out a lot of papers is a rejection? Filling out a few papers is not? It involves conducting market surveys. They have to have statistics on the percentage of minorities in the market area that will be affected. So are you suggesting that the government requires all these onerous requirements? In other words, rejecting it? Like, rather than saying, no, we're going to make sure, we're going to lead to a rejection simply by requiring onerous paperwork. That actually is what it's designed to do. It's designed to avoid prepayment. That's why Congress implemented the LIPA, was to do precisely that. And in fact, once you get to, you've completed your application, then the government will offer incentives. If you reject the incentives, you still can't prepay before you can prepay. You have to offer to sell your property to a non-profit. But if they're serious about the incentives, why would they even need incentives there? If just, you're saying, the decision has been made, they're going to reject it. And for that purpose, rather than just saying, no, they're requiring somebody to fill out some onerous litany of paperwork. That was the structure that Congress devised and came up with in response to, and this is a key point here, the reason the LIPA was passed was because too many of the owners were exercising their prepayment rights, and there was a drop, a shortage, of affordable housing. And so Congress repudiated that very straightforward right and constructed this elaborate scheme, which as the trial court in Franconia on Greenland found, as the trial court in this case analyzed and found, was all designed to avoid allowing an owner to prepay. You're saying that the government's letter should be interpreted in that context. Yes, Your Honor, exactly. Do you happen to have with you, what was the exact date, is it 2002 that Franconia was decided? I don't happen to have a copy of this exchange. June 10th. June 10th, okay. So this exchange took place about six weeks before. A few, yes, a few weeks before Franconia was decided. It was an argument, I quote. Can I ask you about this topic that I discussed with your friend on the other side about this idea which I must say I find deeply strange, that a provision that says you have a right to repay at any time means a right to try to repay once and if denied, you never get to ask again if you don't sue on the first one? Well, I think once, as a court held in Tamerlane, once you've exercised the prepayment right, and this is all post-repudiation, once you've exercised that right, the accrual period is triggered. For that refusal? I really do not understand how under standard law, like the kind of law that has been in place in the employment context forever that's discussed in Ledbetter, that when I commit a wrong each year, that it's not a new, even if it's the same wrong discriminating against you for some impermissible reason, how that's not a new wrong. And actionable from then, not reaching back to the first one. And this is a right to prepay at any time for 50 years. Your Honor, respectfully, the precise question of continuing claims was argued and raised and considered by this court in Tamerlane. It was rejected by Tamerlane. And this court is, whether it agrees with it or not, still is bound until that decision is overruled en banc. It is binding precedent, and the court must follow it. And is that a standard that's been applied in other contexts of contract law, in terms of the differentiation between the continuing violations that exist in the employment context? I'm not familiar with whether or not it's been applied in other contract law cases. I'm happy to look at that and provide supplemental briefing on that issue if the court requires it. Thank you. Thank you, Your Honor. Just a few points in rebuttal. Regarding the question of the regs that were in place prior to ALEPA and what they required and after, I think the other issue that might be coming into play here is before ALEPA was passed, there were a number of congressional moratoria on prepayment. And so there may have been regulations related to those moratoria that were basically a precursor to ALEPA, restricting the right to prepay. But our point there is that, and this is addressed in footnote three on page five of our brief, even before ALEPA, even before this new regime, there was a 180-day waiting period. You couldn't just walk in and say, here's my check I have today. Even then, even before this repudiation, there was that 180-day waiting period and a number of other requirements, including showing that you needed to establish that you could actually get commercial financing and the like. So again, showing that these things just do not happen overnight. Regarding Tamerlane and what was found to be a rejection there, it's a very, very different situation that this court addressed in Tamerlane versus our case in terms of a rejection. There, again, it was the government coming back and saying, you want to prepay. And by the way, there's no debate that the owners must have specified a date for performance because they never could have gotten to the point of receiving an incentive offer from the government had they not done so. And the agency came back and said, you want X, we're going to give you Y. You want to prepay? Instead, we're going to only allow you these incentives. And that was a rejection as of a time for performance. So the language in the Tamerlane opinion may be overbroad, given the circumstances actually presented. I think so, Your Honor. I think the main issue is that time for performance was just not at issue there and therefore not specifically addressed. It's kind of like a jurisprudential game of telephone where the Supreme Court, the whole basis of the Supreme Court's decision was about time for performance. It wasn't specifically at issue in Tamerlane, so it wasn't fully addressed. And then we have Airport Road basically trying to apply Tamerlane but losing sight of the very foundation of Franconi, which again is time for performance. And that brings me to, in terms of the agency's regulatory process, our position has never been that an owner needs to go through that entire process or necessarily even initiate that process to arrive at a breach. What they need to do under contract law is specify or at least produce a writing that communicates a demand for performance as of a certain time, if not immediate performance, and then have the government reject that demand as of the date for performance. And we do not have our requirements here. And would the government's coming back to a specific request for a time performance and saying, well, you need to fill out more paperwork, would that constitute rejection? Would that be sufficient for rejection in your view? Not without a time for performance. No, if you have a time for performance. If you say, I want to do this within 180 days and the government comes back and says, well, you've got to fill out this paperwork first. That's a great example, Your Honor. And the answer is clear under Franconi and all the common law that it's based on is that you would have a breach once that time for performance comes if the government has not actually let you out by that date. Because you've drawn the line in the sand. You're saying, here's my time for performance. Here's when I plan to get out. It's going to be 180 days. That's what I need in order to get my financing lined up and maybe more realistic if it's one property instead of 11 as we have here. And then, yes, even a non-response, and that goes to the Kaczarski case. It goes to the Parkwood case. A non-response as of the time for performance is a breach. But again, you need to have that time for performance under Franconi. Thank you. Thank you. Thank both sides, and the case is submitted.